# CASES

IN THE

# APPELLATE COURTS OF ILLINOIS.

## SECOND DISTRICT—MAY TERM, 1898.

## Chicago, Burlington & Quincy R. R. Co. v. H. B. Miller and Chas. H. Yeagley, partners, under the firm name of Miller & Yeagley.

1. COMMON CARRIERS—*Can Not Limit Liability.*—A common carrier can not, even by express contract, exempt itself from liability resulting from gross negligence or willful misconduct committed by itself, or its servants or employes.

2. SAME—*Valuation of Goods.*—Where the shipper places a value upon his goods, and knowingly enters into a contract for their shipment at a price based on such valuation, he is bound by the contract. While such a contract does not absolve the carrier from the exercise of reasonable care, yet the shipper can not have his property transported at a low rate because of such valuation, and in case of loss compel the carrier to pay more than the valuation in the contract.

Trespass on the Case, for injuries to horses shipped on a railroad. Trial in the Circuit Court of La Salle County; the Hon. SAMUEL C. STOUGH, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the May term, 1898. Reversed and remanded. Opinion filed December 14, 1898.

SAMUEL RICHOLSON, attorney for appellant.

FOLLETT W. BULL and THOMAS N. HASKINS, attorneys for appellees.

MR. JUSTICE CRABTREE delivered the opinion of the court. This was an action on the case brought by appellees

(473)

against appellant, to recover damages for alleged injuries to certain horses of appellees, shipped over appellant's railroad from Chicago to La Salle, in the month of June, 1895. There was a trial by jury, in which appellees obtained a verdict for $3,500. A motion for a new trial was overruled by the court and judgment entered upon the verdict.

Appellant brings the case to this court by appeal and seeks a reversal for alleged errors which are assigned upon the record. The declaration contains three counts. The first alleged that plaintiffs delivered to defendant at Chicago, three horses in a car, to be shipped to La Salle, at the usual price for the carriage of freight of that class; that defendant's servants, through their gross negligence, so handled the car of horses and other cars upon the same track that a collision occurred whereby the horses were greatly bruised and injured, the injuries to each horse being given in detail; that one horse named "Quicksilver" was kept by the plaintiffs exclusively for racing purposes; that the other two horses, named, respectively, "Silver Lily" and "Silver Bell," were kept and owned by the plaintiffs for racing and breeding purposes; that they were all noted for their great speed, and that for the purposes for which they were kept they each had a special value, to wit: "Quicksilver," $3,000; "Silver Bell," $2,000, and "Silver Lily," $4,000, of which it is alleged the defendant had notice. And it is averred that by reason of the injuries inflicted upon them the plaintiffs have been deprived of the use of the horses from the 18th day of June to the time of the commencement of the suit, and that plaintiffs have been put to great charge and expense in nursing and doctoring the horses, and for medicine and doctor's bill, in the sum of $2,000. Alleges the payment of the freight to defendant, and lays the damages at $11,000.

The second count is similar to the first, but contains an additional averment to the effect that plaintiffs had entered said horses in certain races, to contest for purses offered at such races, averring the injury and damages the same as in the first count.

The third count is not substantially different from the second as to its effect.

It appears from the evidence that the horses in question were shipped from Vicksburg, Michigan, over the Grand Trunk Railroad, under a contract with the Grand Trunk Railroad Company, whereby they were to be transported from Vicksburg to La Salle upon the terms and conditions mentioned in the contract, which was in writing, signed by Charles Yeagley, one of the appellee partners, and appears in the evidence as appellees' "Exhibit B." By this contract it appears that the tariff or freight charges for the shipment of the horses were based upon a valuation of $100 on each head of the horses.

Appellees claim that the horses were delivered by the Grand Trunk Railroad Company to appellant at its yards in Chicago in good order. But after the car of horses had reached the yards of appellant in Chicago, appellee Yeagley, who was in charge of the car and riding in it with the horses, was notified by one of appellant's servants that it would be necessary for him to go to the freight house and have the car re-billed before it would be taken out. Thereupon Yeagley went to the freight house and had the car re-billed to La Salle, Illinois, and there signed a shipping contract with appellant, which appears in the evidence as plaintiffs' "Exhibit A." This contract was in substance as follows:

"This contract, made and entered into this 18th day of June, 1895, by and between Charles Yeagley, La Salle, Illinois, of the first part, and the Chicago, Burlington and Quincy Railroad Company of the second part, witnesseth, that the said railroad company agrees to transport one car containing three horses * * * from Chicago to La Salle, and the said first party agrees to deliver said animals to said railroad company for transportation between the points aforesaid upon the following terms, viz.: That whereas, the said party, before delivering the said animals to the said railroad company, demanded to be advised of the rate to be charged for the carriage of said animals as aforesaid, and thereupon was offered by the said railroad company alternative rates proportioned to the value of the said ani-

mals, such value to be fixed and declared by the first party or his agent; and whereas, such alternative rates are made in pursuance of the provisions relating thereto of the classification of freights adopted as regulations by the said railroad company, and fully set forth, to wit: Live stock ratings given above are based upon declared valuations by shippers, not exceeding the following : each horse or pony, gelding, mare or stallion, mule or jack, $100. * * * When the declared value exceeds the above an addition of twenty-five per cent will be made for each one hundred per cent, or fraction thereof, of additional declared valuation per head, which said alternative rates are fully shown in and upon the regular tariffs printed, published and posted by the said company, as required by law; and, whereas, the first party, in order to avail himself of the said alternative rates, and to secure the benefits thereof, has declared and does hereby declare, the said animals to be of said values, to wit: each horse value, one hundred dollars, to which value the rate aforesaid is apportioned by the classifications and tariffs aforesaid. Now, in consideration of the premises and of the foregoing, it is expressly agreed that for all purposes connected with, resulting from or growing out of this contract, and the transportation of the said animals pursuant thereto, the value of said animals, and each thereof, shall in no case exceed the said valuation. It is further agreed in consideration of the alternative rate so made by the said railroad, and accepted by the first party, that in case of loss or damage of said animals, whether resulting from accident or negligence of said railroad company or its servants, the said railroad company shall not be liable in excess of the actual loss or damage, and in no case shall the said railroad company be liable in any manner in excess of the agreed valuation upon such animal lost or damaged, nor shall the said railroad company be liable for loss or damage after delivery to any connecting line. * * * And in consideration of free transportation for * * * persons designated by the first party, hereby given by said railroad company, such person to accompany the stock, it is agreed that the said car, and the said animals contained therein, are and shall be in the sole charge of such persons for the purpose of attention to and care of the said animals, and that the said railroad company shall not be responsible for such attention. It is agreed that the said animals are to be loaded, unloaded, watered and fed by the owner or his agents in charge; that the second party shall not be liable for loss from theft, heat

or cold, jumping from car or other escape, injury in loading or unloading, injury which animals may cause to themselves or to each other, or which results from the nature or propensities of such animals, and that the railroad company does not agree to deliver the stock at destination at any specified time."

Appellant insists that, under this contract, even if liable at all, in no event can appellees recover more than $100 for each horse. Appellee Yeagley testifies that he did not place any value on the horses, but it appears from the evidence of two witnesses that he read over the contract, and that he then said " if one of the horses was hurt they would find out whether it was worth $100 or not;" and the night agent of appellant, who signed the contract on its behalf, swears that he then told Yeagley he "could place a higher valuation on them if he wanted to," but that Yeagley said he "didn't want to, the rate was too high as it was."

This conversation Yeagley does not specifically deny, nor does he deny having read over the contract and becoming fully informed of its contents before the horses were injured.

Appellees having recovered a verdict and judgment for $3,500 for the alleged injuries to the three horses, the question is fairly presented for consideration as to whether or not this limitation of liability and value fixed in the contract is of any force or effect as between the parties to it.

It is certainly the well-established doctrine of the courts of this State, that a common carrier can not, even by express contract, exempt itself from liability resulting from gross negligence or willful misconduct committed by itself, or its servants or employes. C. & N. W. Ry. Co. v. Chapman, 133 Ill. 96; The Wabash Ry. Co. v. Brown, 152 Ill. 484.

But in the Chapman case, *supra*, it was said that a carrier may require the value of goods offered for transportation to be fixed by the shipper, to protect itself against fraud in case of loss, although the mere inserting a value in the shipping bill, by the agent of the carrier, without the assent of the shipper, would not bind the latter, and the assent is not necessarily to be inferred from the acceptance of the bill of lading. Adams Express Co. v. Stettaners, 61 Ill. 184.

Where the shipper places a value upon his goods, however, and he knowingly and voluntarily enters into a contract for their shipment, at a price based on such valuation, we see no reason why he should not be bound by the contract. While such a contract does not and ought not, absolve the carrier from the exercise of reasonable care, yet there would be no justice in allowing the shipper to get his property transported at a cheap rate because of the low valuation, and then, in case of loss, compel the carrier to pay several times the valuation placed in the contract, without any additional compensation.

It is matter of common knowledge that the more valuable property is, the greater care, as a rule, will be exercised by those having it in charge. Transportation companies are provided generally with cars specially fitted up for carrying horses and other live stock with comfort and comparative safety, but it is reasonable to suppose that a higher rate will be charged for the use of a car specially built for the carriage of horses, than for an ordinary box or freight car in which the owner erects temporary stalls for his horses, as was done in the case at bar. It is not unreasonable to suppose that had appellee Yeagley told appellant's agent that the horses in question were valuable race horses, worth from $2,000 to $4,000 each, the agent would have declined to ship them at the rate mentioned in the contract, and had a greater rate been charged, it may be greater care would have been exercised in their handling and transportation. The agent swears that he had no information that the horses were race horses. The valuation placed upon them in the contract with the Grand Trunk Railroad Company was $100 each, and there is nothing to show the agent of appellant had any other information as to their value. Had Yeagley informed appellant's agent that these horses were worth $9,000 (the value he now places upon them) it would have been the agent's duty to have added twenty-five per cent to the freight charges for every additional 100 per cent of declared value, over and above the $100 per head placed upon the horses, and of this Yeagley was in-

formed by the terms of the contract, provided he read it, as we think the evidence shows he did.    Whether he knew the terms of the contract, and voluntarily accepted them in consideration of getting the lower freight rates, was a question of fact for the jury, to be found by them upon proper instructions.

We think the instruction given for the plaintiffs was too broad upon this feature of the case.    It squarely tells the jury, without qualification, that the defendant can not relieve itself from liability for depreciation in the market value of the horses by reason of the $100 limitation value contained in the contract of shipment, provided the jury believed from the evidence that such depreciation exceeded such $100 limitation.    Conceding it to be the law of the State that a common carrier may not, by contract, exempt itself from liability for damages suffered by reason of its gross negligence, yet we do not understand it to be the law that such damages may not be fixed and liquidated in advance, by a contract between the parties, if fairly, voluntarily and understandingly entered into by each of them. In many cases the most serious question involved in the litigation is as to the amount of the damages, and when values are to be ascertained from the opinions of witnesses, it is frequently a matter of great difficulty to justly determine the damages in a given case.    Opinions as to value often take a very wide range, and more particularly is this true as to that species of property known as " race horses," which are not infrequently a far greater source of loss than of profit to their owners.    This is a matter of common knowledge and observation.    This being true, and transportation companies knowing they may be frequently called upon to carry such property, seek to protect themselves by contract with the owner as to the damage to be paid in case of loss.    This is the only way they have of protecting themselves against claims based upon speculative or fictitious values, and if such contracts are fairly made we see no reason why they should not be enforced.

The instruction complained of seems to ignore this view

of the case and we think should not have been given. The question as to whether the contract was voluntarily and fairly entered into by appellee should have been left to the jury.

Again the instruction allowed a recovery for depreciation in the market value of the horses by reason of the alleged injury. Under the declaration we think this was improper. The only damages claimed in the declaration were the loss of the use of the horses from the time of their injury to the commencement of the suit. If the plaintiffs had desired to recover for depreciation in maket value, they should have declared accordingly. Considerable testimony was introduced by plaintiffs, and admitted over the objection of defendant, as to the racing propensities of the horses, their speed performances, entry for races and matters of that nature, which might have been important as bearing upon the question of the value of the use, if not too speculative, but which would seem to us improper and unimportant as applied to depreciation in market value. Evidence that the horses had developed extraordinary speed, taken in connection with other evidence that the horses had been entered for races in which large purses were offered to the winners, followed again by evidence that the horses, by reason of their injuries, were unable to compete for the purses, would naturally tend to mislead the jury and cause them to place the damages upon a speculative basis, having little reference to what the horses would have sold for in the market before or after the injury.

The court seems to have been of the opinion that the declaration was sufficient to warrant a recovery of depreciation in market values, but even if this be so, the plaintiffs should have been required to elect which class of damages they would seek to recover for, and the evidence should have been limited accordingly. But on the trial evidence seems to have been admitted to show damages for the loss of the use of the horses as well as for depreciation in market value, indiscriminately, and it is impossible to tell for what species of damages the jury rendered their verdict.

Evidence was also admitted by the court, over appellant's objection, as to the performance of the horses in question in races in Michigan, in the year 1897, which was long after the commencement of this suit. We think this evidence was improper. The result of such races could not be taken into account in estimating either the depreciation in market value of the horses or the value of the loss of their use before the commencement of the suit, and furnished no proper basis for estimating the plaintiffs' damages.

Many other complaints are made as to the introduction of evidence, but what we have already said will substantially apply to those objections without going into them in detail. Complaint is made that the court improperly modified the fifth instruction asked by the defendant. While it would not have been improper to have given the instruction as asked, we think there was no serious error in the modification.

We think the seventh instruction asked by the defendant contained a correct principle of law and might properly have been given as requested, but the modification was too strong against the defendant and made it a weapon against it. There was no claim that Yeagley made any false statement to the agent of appellee as to the value of the horses. The real question was, did he understandingly and voluntarily make the contract, and obtain a reduced rate for the shipment of the horses upon the valuation placed in the contract? If he did we think he was bound by it, and it was not necessary that he should have made false statements, intentionally to mislead the defendant, before the latter could have the benefit of the contract.

We do not deem it important to discuss the alleged errors in refusing other instructions asked by defendant, as the judgment must be reversed for the reasons above given, and what we have said in discussing the questions raised will be a sufficient guide for proper instructions to the jury in a subsequent trial.

The judgment will be reversed and the cause remanded.